***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner in her denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to any misjoinder or nonjoinder of parties.
3. Plaintiff is Hubert Chambers.
4. Defendant is, on the date of the alleged injury and at all times pertinent hereto, Transit Management of Charlotte, which is a corporate self-insured employer.
5. Defendant regularly employed three or more employees and is bound by the North Carolina Workers' Compensation Act.
6. An employer-employee relationship existed between defendant and plaintiff on December 4, 2000, the alleged date of injury.
7. Plaintiff's last date of employment was December 4, 2000.
8. The correct average weekly wage for plaintiff is $747.00, which results in a compensation rate of $467.21.
9. The parties stipulated into evidence a packet labeled StipulatedExhibit 1 consisting of thirteen tabs that included plaintiff's medical records, Job Site Analysis, Employee Injury and Illness Report Form, Operator Performance Evaluation, Bus Route/Door Opening Data, Industrial Commission Forms, and a letter to Randy Mullinax dated June 19, 2002.
10. The issues before the Full Commission are:
a. Whether plaintiff suffered a specific traumatic incident to his neck and back while working for defendant pursuant to N.C. Gen. Stat. §97-2(6);
b. Whether plaintiff suffers from an occupational disease to his neck, back, and left arm pursuant to N.C. Gen. Stat. § 97-53(13);
c. Whether the plaintiff suffered an injury by accident to his neck, back and/or left arm pursuant to N.C. Gen. Stat. § 97-20;
d. The amount of compensation due plaintiff, if any, pursuant to N.C. Gen. Stat. § 97-29 subsequent to December 4, 2000; and
e. Payment of medical care supplied for treatment of the injuries to plaintiff pursuant to N.C. Gen. Stat. § 97-25.
 ***********
Based upon all of the evidence of record and reasonable inferences drawn therefrom, the Full Commission finds as follows:
 FINDINGS OF FACT
1. On September 27, 2001, plaintiff filed a Form 33 requesting a hearing to determine compensability for medical care and wage loss benefits due to a left ulnar nerve entrapment neuropathy and a cervical neck injury. Defendant filed a Form 33R on October 19, 2001, denying that plaintiff had sustained any compensable injuries.
2. At the time of the hearing before the Deputy Commissioner, plaintiff was 59 years old and was a high school graduate. Plaintiff's previous work history included working in a warehouse and a clothing factory.
3. The essential facts in this case are not in dispute. Plaintiff was employed as a bus driver with defendant for 30 years from April 9, 1970, until December 4, 2000. While operating a bus, plaintiff used his hands approximately 90% to 100% of the time.
4. Plaintiff drove two types of buses, the Flexible or "Flex" bus and the Nova bus. Evidence of plaintiff's job duties was presented by plaintiff's testimony; the testimony of Bob Covington, Superintendent of Safety and Training; a videotape depicting plaintiff on both buses as he demonstrated his job duties; and a job site analysis performed by Teresa Lee Hoey. In addition, defendant provided evidence based on a survey concerning the number of door openings on plaintiff's four routes, which was conducted in conjunction with Larry Kopf, defendant's Director of Scheduling. Defendant also made the crank handle and switch used by plaintiff available at the hearing before the Deputy Commissioner.
5. Robert L. Covington Jr., Superintendent of Safety and Training for defendant, agreed that driving those particular buses requires repetitive use of the left and right upper extremities and that more functions are required to be performed with the left arm and hand as opposed to the right. Randy Mullinax, Director of Safety and Administration for defendant, agreed that the job performed by plaintiff required repetitive and frequent use of the hands and arms.
6. According to the Job Site Analysis performed by defendant's expert, use of the upper extremities was listed as "frequent to constant" with ergonomic risk factors of "repetition, vibration from seat, and static sitting postures."
7. Plaintiff was able to perform his job duties until December 4, 2000. On that date, he was assigned a new bus route and experienced severe pain in his left arm, shoulder and neck. Plaintiff was unable to return to work because of his occupational disease and specific traumatic incident. After several visits to his family physician, plaintiff was evaluated by Dr. Thomas H. Buter, Dr. Daniel B. Murrey, and Dr. Alfred L. Rhyne at Charlotte Orthopedic Specialists. On March 5, 2001, Dr. Murrey referred plaintiff to Dr. Tim E. Adamson, a neurosurgeon. From that date forward, Dr. Adamson has been plaintiff's primary treating physician. Dr. Adamson eventually performed a cervical neck surgery and left ulnar nerve release.
8. The determination of compensability in this case turns primarily upon the medical evidence and the opinions set forth in the depositions of Dr. Tim B. Adamson and Dr. Catherine N. Dover. In his deposition conducted on January 8, 2003, Dr. Tim E. Adamson, a board certified treating neurosurgeon, testified that during his 13 year association with Carolina Neurosurgery Spine Center he has evaluated and treated hundreds of patients with ulnar nerve neuropathy. Dr. Adamson performed two surgeries on plaintiff: (1) a microdiscectomy on the left at C7-T1 of plaintiff's cervical spine on April 26, 2001, and (2) a left ulnar nerve (cubital tunnel) release on September 28, 2001. Dr. Adamson described the relationship between these conditions as a "double crush syndrome." Dr. Adamson testified, and the Full Commission finds as fact:
 Yes, although there was some difficulty in distinguishing the sources of a lot of his pain. It's not uncommon to have what's referred to as a double crush syndrome in which there's irritation at two sites along the same nerve, it could be involving the neck and then also down, in this case, the ulnar nerve at the medial epicondyle, or just at the elbow.
 It's somewhat poorly understood as to exactly why it occurs, but may be related just to the fact that you have irritation of the nerve at one site, and if you have a tendency or predilection to develop irritation at another site, just the increased sensitivity of the nerve from one site of pressure will sometimes make both sites symptomatic, and significantly so. It's not uncommon to have both of them require treatment to break the whole pattern.
Dr. Adamson's testimony is given great weight because of his specialty and because of his treatment experience with plaintiff.
9. Dr. Adamson rendered opinions, which the Full Commission finds to be fact, that plaintiff's job duties with defendant caused or aggravated the conditions for which treatment was rendered and that plaintiff's job placed him at an increased risk of developing these conditions. The sudden pain to plaintiff's neck on December 4, 2000, qualifies under North Carolina law as a specific traumatic incident of the work assigned.
10. On October 25, 2002, the parties took the deposition of Dr. Catherine N. Dover. Dr. Dover, who has never examined or treated plaintiff, performed a medical record review at the request of defendant. She testified that during the entire course of her practice she has seen approximately 6 to 12 individuals with cubital ulnar nerve conditions. On cross examination, Dr. Dover testified regarding repetitive stress or strain injuries as follows:
 Q. What types of injuries result from repetitive stress, repetitive strain injuries? What types of injuries do you see as a result of those conditions?
 A. Well, the ones that come to mind would be carpal tunnel syndrome, stress fractures in the foot from running extensively. The ulnar nerve entrapment, or I guess — I guess you could have some back strain and eventually degenerative changes if you do heavy lifting continuously.
 Q. So — and the most common parts of the body that are affected in repetitive stress injuries would be that part of the body which does repeated action over a long period of time?
A. I would agree with that.
Dr. Dover went on to state as follows:
 Q. And what is the physiological process that that repetitive activity affects that results in the development of symptoms and the kind of problems that you identified?
 A. Well, I'm not an expert, but in my opinion, I would think that it would be a movement that is repetitive and stresses an area usually with — where there is a nerve.
 Q. And would that same kind of nerve mechanism be what would be taking place with an ulnar nerve entrapment problem?
 A. I'm not sure if there is a band involved, fascia — fascial band there, but there is some type of a compression that would cause the inflammation and/or symptoms of the nerve, the deficits that correlate with that nerve.
 Q. And what would the patient who was having those kinds of problems physically experience with the ulnar nerve problem?
 A. They would probably experience tingling, paraesthesia, maybe numbness. It depends on — they can even have motor weakness. It depends on what state, how acute. It could be intermittent, it could be gradual.
Regarding the ability of physical activity to aggravate an ongoing physical condition, Dr. Dover testified as follows:
 Q. Can a repetitive physical activity aggravate an underlying physical condition and cause it to become sufficiently symptomatic to require treatment?
A. I think that's possible, yes.
 Q. Can a job change that requires more strenuous or physically demanding activity aggravate an underlying physical condition and cause it to become sufficiently symptomatic so as to require treatment?
A. I think that's possible.
When asked to assume the objective findings of the CT scan, MRI and nerve conduction studies administered to plaintiff, Dr. Dover stated as follows:
 Q. So if you assume he (plaintiff) has the problems that are identified on these diagnostic studies and the operative record, would this mean that he would have a greater possibility of developing symptoms related to this — these conditions through the performance of physical activity than somebody that did not have these kind of objective findings?
 A. Well, certainly if he's got some abnormality, he would be more at risk for developing symptomology than someone who was normal and did not have abnormalities.
 Q. That's correct. The — so somebody with these kind of objective findings, if they were doing physical activity, it could be more likely that that could cause symptoms than somebody that does not have these objective findings due to the same physical activity; would that be correct?
 A. It depends on the physical activity. Certain physical activities, I would agree, yes, that would involve strain on the neck.
 Q. Right. Now, would the same rationale apply with the problems that Mr. Chambers has with his left ulnar nerve? That somebody that has that condition would be more likely to experience problems with use of the left arm than somebody that does not have a left ulnar nerve neuropathy?
 A. If they use it — if they use their arm repetitively, yes.
 Q. So the repetitive activity could aggravate the left ulnar nerve problem?
 A. That would be my prediction, my assumption of how it would physiologically make sense.
11. Plaintiff came under the care of Dr. Adamson on April 2, 2001. Dr. Adamson was concerned that plaintiff had a disc herniation at C7-T1 and recommended a microendoscopic discectomy at C7-T1. He further noted that there was a degree of spondylotic disease throughout the cervical spine that would likely require intervention.
12. On April 26, 2001, Dr. Adamson performed a left C7-T1 microendoscopic discectomy. Plaintiff returned to see Dr. Adamson on May 14, 2001, and indicated that he had a minimal amount of soreness but was still experiencing intermittent tingling and paresthesias.
13. Plaintiff again saw Dr. Adamson on June 11, 2001. Dr. Adamson noted that plaintiff's cervical condition had made good progress; however, plaintiff had nocturnal ulnar entrapment symptoms. Therefore, plaintiff was placed on a trial of nocturnal splinting.
14. On July 18, 2001, Dr. Adamson cleared plaintiff to return to work, but noted that plaintiff was having intermittent ulnar entrapment symptoms and was going to require a nerve conduction study.
15. Plaintiff did not return to work following his release on July 18, 2001, by Dr. Adamson. Instead, plaintiff contacted Dr. Adamson's office to be kept out of work. Dr. Adamson agreed because the nerve conduction studies were pending, as it is typical to keep patients out of work until studies are performed. On July 27, 2001, plaintiff underwent a nerve conduction study performed by Dr. Hawes, which revealed evidence consistent with a moderate left ulnar neuropathy.
16. Thereafter, on September 12, 2001, plaintiff again saw Dr. Adamson and treatment options were discussed. Plaintiff was interested in proceeding with surgery. Therefore, plaintiff underwent a left ulnar nerve release performed by Dr. Adamson on September 28, 2001.
17. On October 22, 2001, plaintiff returned to Dr. Adamson, who examined plaintiff and anticipated an additional 4 to 6 weeks of recovery. Thereafter, Dr. Adamson saw plaintiff on January 23, 2002, and recommended that plaintiff undergo a functional capacity evaluation.
18. Plaintiff underwent a functional capacity evaluation on March 5, 2002. Dr. Adamson reviewed the functional capacity evaluation and concurred with the results. On May 13, 2002, he rated plaintiff with a 30% permanent partial impairment of the left upper extremities, which Dr. Adamson later clarified to be the arm and not merely the hand. Furthermore, according to Dr. Adamson, plaintiff is capable of sedentary to light work, but not of driving the bus due to the use of the left hand and public safety issues.
19. Plaintiff has not returned to work for defendant or another employer. The greater weight of the evidence demonstrates that plaintiff is incapable of returning to his former employment. Defendant has neither offered work to plaintiff within his restrictions, nor offered or provided vocational rehabilitation or retraining.
20. Plaintiff is entitled to disability compensation until he is able to return to work at the same or greater wages than he was earning at the time he suffered his occupational diseases and specific traumatic incident.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The medical and testimonial evidence supports compensability of plaintiff's ulnar nerve entrapment neuropathy condition, "double crush syndrome," and aggravation of cervical spine condition as occupational diseases under N.C. Gen. Stat. § 97-53(13). Additionally, since the disabling aggravation of the cervical spine occurred within a cognizable time period, it qualifies as a specific traumatic incident. N.C. Gen. Stat. § 97-2(6).
2. Disability caused by, or death resulting from, a disease is compensable only when `the disease is an occupational disease, or isaggravated or accelerated by' causes and conditions characteristic of and peculiar to claimant's employment. Walston v. Burlington Industries,304 N.C. 670, 680, 285 S.E.2d 822, 828, amended on rehearing, 305 N.C. 296,285 S.E.2d 822 (1982) (emphasis added); Goodman v. Cone Mills,75 N.C. App. 493 at 497, 331 S.E.2d 261 at 264 (1985). Where, as here, there is evidence of both causation and aggravation connected to particular aspects of an employee's job duties (i.e. repetitious activity) to which the general public is not exposed, compensability is logically and legally warranted. This perspective is consistent with the foundational policy considerations of the Workers' Compensation Act.
3. The medical and testimonial evidence supports compensability of plaintiff's cervical injury as a specific traumatic incident under N.C. Gen. Stat. § 97-2(6).
4. Plaintiff is entitled to have defendant pay for medical treatment rendered as a result of his compensable occupational diseases and specific traumatic incident in accordance with N.C. Gen. Stat. § 97-25
as limited by § 97-25.1.
5. Plaintiff is entitled to disability income until such time as he is able to earn wages. In rendering vocational rehabilitation, defendant shall be mindful of plaintiff's age, education, and prior work experience. N.C. Gen. Stat. § 97-29.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fee hereafter awarded, defendant shall pay to plaintiff compensation at the rate of $467.21 from December 4, 2000, and continuing until plaintiff is able to return to work or further orders of the Industrial Commission. Defendant shall pay the accrued amount thereof in a lump sum, subject to the attorney fee hereafter awarded. Defendant shall pay interest at 8 percent per year from September 20, 2002, until paid.
2. Defendant shall pay 25% of the lump sum amount directly to plaintiff's attorney and shall thereafter send to plaintiff's counsel every fourth weekly compensation payment as reasonable attorney fees. Defendant shall pay 75% of the lump sum and all of the interest to plaintiff.
3. Defendant shall pay all medical providers in accordance with the Industrial Commission Medical Fee Schedule and the Industrial Commission Hospital Fee Schedule, as appropriate.
4. Defendant shall pay the costs.
This 23rd day of October 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER